[Civ. No. 338. Fifth Dist. June 1, 1964.]

**A. C. SHOEMAKE et al., Cross-complainants and Respondents, v. F. H. WOODRUFF & SON, INC., Cross-defendant and Appellant.**

Gant & Gant and Wilbur S. Legg for Cross-defendant and Appellant.

Zeff, Halley & Price and William Zeff for Cross-complainants and Respondents.

CONLEY, P. J.—This is the second appeal in this litigation. (*Hayman* v. *Shoemake,* 203 Cal.App.2d 140 [21 Cal. Rptr. 519].) The plaintiffs, Louis Hayman and George Covert, who are not parties to the appeal, bought from the defendants and cross-complainants a field of onions and thereafter sued them for damages because of the breach of their express warranty that the onions were Asgrow Y-50's, a specific variety which had previously produced excellent crops in the San Joaquin Valley. A cross-complaint was filed by the defendants, Shoemake and Gnesa, against F. H. Woodruff & Son, Inc., the corporation which had sold the identical seed to defendants and cross-complainants on an earlier but similar warranty.

The amount originally awarded to the plaintiffs in the superior court as against the defendants was the sum of $66,182.68, and the cross-complainants were given judgment against the seed company and its employee in the sum of $93,523.68. The defendants did not appeal from the judgment awarded to plaintiffs as against them, and it long since has become final. In the earlier opinion, this court held that it was improper for the trial court to add routinely the damages awarded on the complaint to the damages awarded on the cross-complaint as the two warranties, while applying to the same seed, were in fact different transactions and that it did not follow under the pleadings and the rules of law that defendants should be additionally awarded whatever damages were given to the plaintiffs.

By stipulation all evidence received in the first trial was received in evidence in the current trial.

As stated in the former opinion: "The two main questions raised on the appeal from the judgment on the cross-complaint are whether cross-defendants are liable on a theory of warranty, and if so, whether the damages awarded are proper."

This court determined that an express warranty was in fact made by the cross-defendant company and that cross-complainants were entitled to recover damages, but the judgment would have to be reversed; the case was sent back for a new trial "on the question of damages only." In the opinion, the court says: "The proper measure of damages is the difference between the reasonable market value of the crop as actually raised and sold and the reasonable market value of the crop which would have been produced and sold if the warranty had been complied with, necessarily deducting in each instance from the gross market value of the product the cost of planting, irrigation and care of the crop and the cost of harvest, transportation and sale. (*Paul* v. *Williams,* 64 Cal.App.2d 696, 703 [149 P.2d 284]; *Newhall Land & Farming Co.* v. *Hogue-Kellogg Co.,* 56 Cal.App. 90, 95 [204 P. 562]; 43 Cal.Jur.2d, Sales, § 289, p. 411; 46 Am.Jur., Sales, § 750, pp. 877-879.) Obviously, net profit cannot be ascertained without deducting the cost of producing a crop. . . .

"Complaint is made by appellants that the market for onions, as shown by the evidence, varied greatly from time to time, that the sale dates adopted by the court for the calculation of damages were uncertain, and that the figure assumed for market value of the theoretical portion of the potential crop was at an unduly high point on the scale. The mere fact that it is difficult to ascertain exact damages is no reason to eliminate them completely. (*Noble* v. *Tweedy,* 90 Cal.App.2d 738, 745 [203 P.2d 778]; *Phalanx Air Freight, Inc.* v. *Nat. etc. Freight Corp.,* 104 Cal.App.2d 771, 776 [232 P.2d 510]; *Smith* v. *Mendonsa,* 108 Cal.App.2d 540, 543 [238 P.2d 1039]; 14 Cal.Jur.2d, Damages, §§ 65-66, pp. 690-692.) However, the wisdom of the old saw, 'There's many a slip 'twixt cup and lip' is particularly applicable to farming operations. There are so many elements that may effect a complete reversal of expected profits, including weather, farming practices, irrigation timing, the nature of the harvest and transportation systems employed and the condition of the market, that care should be taken by a trial court not to be overoptimistic as to the reasonable market value of a theoretical crop. These are considerations to be given due weight upon retrial of the case."

Upon retrial, the court, of course, owed a duty to follow the directions contained in the opinion relative to the ascertainment of damages.

The trial court correctly found that the actual crop of onions harvested and sold at Stockton was 42,634 50-pound bags of onions and that if the seed had been as warranted the harvest would have produced 82,784 bags; also that the beginning of marketing would have been two weeks earlier than it in fact was. The court also found, incorrectly as hereinafter noted in detail, that the average selling price per bag would have been $2.10 for the total theoretical crop.

■ Before examining in detail the method and the mathematical elements used by the trial court to reach the somewhat startling conclusion that the damages which should be awarded to the cross-complainants were $95,718.22 (that is to say more than $2,000 in excess of the former judgment on the cross-complaint), we must examine one of the points made by appellant, which was not sustained by the trial court. This contention was that by reason of certain evidence offered by the appellant the trial court should have found that the seed actually sold by the cross-defendant company to cross-complainants would have matured just as early as Asgrow Y-50 seed; this point was eliminated from consideration on the second trial for the reason that this issue was decided at the first trial and affirmed on the first appeal. This court expressly reversed the first judgment as to damages only and it is clear that the issues of warranty and breach of warranty were finally concluded; no such question could be urged on the retrial.

■ An important lapse on the part of the trial judge in estimating damages is that he used the opinion of a cost accountant as to what the probable cost of harvesting the theoretical crop of onions would have been rather than the figure which constituted the exact amount which Mr. Shoemake and his partners by express contract would have had to pay for the harvest. Shoemake and partners sold to plaintiffs the field of planted onions at $400 an acre with an additional agreement to pay to Hayman and Covert the sum of $1.00 per bag for harvesting the onions. This agreement was binding upon the parties and it was explicit as to what Shoemake and the Gnesas would have had to pay as harvesting costs; it is obviously erroneous to substitute for that definite and realistic figure of $1.00 per bag the sum of $0.72 testified to as theoretical cost by the accountant. In order to do justice it is essential that there be deducted from the theoretical proceeds of the theoretical crop an actually proven harvesting expense of $1.00 per bag. The difference in net proceeds would, there-

fore, have been $23,179.52. This figure is arrived at by multiplying 82,784 bags by $0.28, the difference between the $1.00 contract price and the $0.72 theoretical cost of harvest. Any award of damages must obviously be reduced by this amount.

 The damage figure of $95,718.22 is firmly based upon an erroneous finding of the court unsupported by the evidence: "that the said onions, if the seed with respect to the same had been as warranted by the cross-defendant, would have had an average selling price of $2.10 per bag. ..." This $2.10 figure which was also improperly used in the first trial has no valid support in the evidence. And it is precisely such an item that this court mentioned in its first opinion where it is said that there are many elements to be considered in the calculation of expected or hoped-for profits such as: "farming practices, irrigation timing, the nature of the harvest and transportation systems employed and *the condition of the market*" (italics added); this court expressly stated in the initial opinion that it upheld the lower court as to its findings that there was a breach of warranty and that farming practices had been properly carried out but that damages must be reexamined. In tracing this erroneous figure through the record, we find that it had its origin in testimony by the witness Covert early in the first trial in a most casual manner:

"THE WITNESS: The Market Report showed an average of two to two twenty-five, f.o.b. for fifty-pound sacks.

" . . . . . . . . . . . . . . . . . .

"A. In computing—in computing out—our loss, we took a conservative figure below what the Government Market Report showed of two dollars and ten cents a bag and multiplying the two ten by the amount of bags we should have harvested, we arrived at a figure of one hundred and seventy-three thousand, eight hundred and forty-six dollars."

In the second trial, the witness Draper purported to rely upon it as valid saying that he had verified the figure for himself using the Federal State Market News and that it was: "... a simple average of the f.o.b. prices that the Federal State Market News Service showed for that period, a simple arithmetical average." He also stated he used only the prices for "medium" onions.

This conclusion is patently false. While it is difficult in some respects accurately to calculate damages with respect to a theoretical crop of over 80,000 bags of onions, it is the duty of the trial court to be realistic, and to follow as closely

as possible normal agricultural practice. To assume that 82,784 bags of onions could have been harvested, moved on trucks and sold in one day is unrealistic and fanciful. The law today, as in Blackstone's time, is common sense. It was respondents' duty to prove their case, including a synthesis of the elements going to make a sale. The only evidence in the case is that it took 13 days to move and sell some 42,634 bags; the best conclusion from that evidence that respondents could ask for was that it would have taken equally long to move and sell 82,784 bags. If we take all the listed prices for medium onions for the period from June 17 to July 1 we reach an average of $1.99; if we drop the day July 1 and take the average to June 30, we arrive at an average price of $2.05. It is impossible to find how the $2.10 figure was reached. If we average all medium and jumbo prices together from June 17 to July 1, we acquire an average of $2.03 per bag; if we average all medium and jumbo prices from June 17 until June 30, we arrive at the figure $2.07. Onions were actually sold on 13 separate days over a 15-day period; consequently, it is logical to include July 1, in the average—it making the 15th day.

In the addendum to this opinion, Tables I, II, III, IV, and V illustrate mathematically the results that should logically follow a sale of the actual and theoretical crops.

Let us examine further the use of the erroneous $2.10 figure. Mr. Draper testified:

"Q. ... From what source did you derive the two dollar and ten cent figure?

"A. In working with Mr. Shoemake and Mr. Gnesa, these were the figures that I was given, and also my knowledge of the onion market at that time indicates that this is a fair f.o.b. figure.

"Q. In other words, you discussed this matter and they indicated that they wanted you to use that as a multiple, is that correct? A. That's correct.

". . . . . . . . . . . . . . .

"Now, did you take into consideration differences in size between jumbo and medium with respect to the figure you used? A. In looking at the Federal Market Report, there was such a very little variation between f.o.b. prices on jumbos on the one hand and mediums on the other, that I didn't think that it was necessary to differentiate." The medium size was assumed. The figure of $2.10 is not supported by the evidence.

██ A cost item for brokerage and incidental expenses was completely ignored by the court. Apparently the only testimony in the record on the subject is that such brokerage was a likely cost and should have been considered. Mr. Covert expressly testified at the first trial:

"Q. All right, so we start with gross receipts, we take out the commission and we've got your net here?

"A. Yes.

"Q. Under the column 'Price Per Sack,' is that correct?

"A. Yes.

"Q. There are no other deductions to worry about?

"A. No.

"Q. Is that brokerage charge a standard percentage?

"A. No, it varies from five to ten cents per bag.

"Q. Depending upon what?

"A. Depending upon the amount of service performed.

"Q. I see. So here, with respect to the date, 7-3, under 'Price Per Sack,' we have a dollar ninety, net, that was after deduction of the commission? A. Yes.

"Q. And I see that in most instances a commission was actually deducted, was it not?

"A. As I recall, most of these onions have—went to Canada, so—for that reason, I think they would—probably brokerages involved.

" . . . . . . . . . . . . . . . .

"MR. GANT: Q. Now, so far as your average price over the period just mentioned, June 15 to July 1st, is concerned, did you take into consideration brokerage commissions?

"A. We figured the average—when we made our computation, we figured it a little—about a dime per sack, lower than—than what the Government figures showed, to be on the conservative side and take care of some extra expenses.

"Q. I see; and that was to cover any potential commission that might have been charged?

"A. Brokerages or incidental expense.

"Q. Do you regard that as a reasonable charge in that connection? A. Yes."

We find no additional evidence on this subject at the second trial, and no finding was made as to such costs; such an item cannot be ignored.

██ As appellant attempted to prove at the trial and pointed out in the opening brief, respondents did not support their claim for damages by proper proof. To indicate mathematically the impossibility of respondents' claim, we have

worked out a tentative and approximate chart (Addendum - Table V) based on the actual sale of the 42,634 bags of onions and of the theoretical sale of the total 82,784 bags. In this connection, there was no listed market on Saturday, June 15, or Sunday, June 16; Monday, June 17, was the first day upon which sales were listed. June 17 was "two weeks earlier than [the crops] were actually harvested and marketed." If the same harvesting and marketing methods were employed for the theoretical crop as were used in the sale of the actual crop (the testimony showed that the actual marketing of the crop was by the Covert organization and discretion involved in marketing was left to Mr. Covert), it would be reasonable to assume that plaintiffs would be able to handle approximately the same percentage of the 82,784 bag crop each day as they were able to handle of the actual crop of 42,634 bags.

Projecting this harvest and sale according to the days and prices listed on the marketing report two weeks prior to the actual sale we find that the theoretical crop would have sold for something like $166,324.73 instead of respondents' claimed figure of $173,846.40. There is no evidence that 82,784 bags of onions would or could have been sold on any one day.

Appellant correctly urges that there is insufficient evidence in the record to support the finding that so large a supply of onions could have been sold at a price of $2.10 for each bag. Referring to the chart (Table V) it is shown that on June 24 and June 25 more bags would have been sold than on all the other days, yet the average price of medium onions amounted to $1.95 a bag on June 24 and $1.90 a bag on June 25. Respondents' evidence at the trial was to the effect that *one size* of onion was assumed in assessing damages and that that size was medium; the erroneous testimony was that a "simple arithmetical average" of the prices shown by the Federal State Market News Service was used to reach the $2.10 per bag price.

The actual crop was sold over a period of 15 days; there is no evidence in the record to suggest that plaintiffs would have been more efficient in harvesting the theoretical crop of 82,784 bags than the actual crop. Assuming that plaintiffs would be able to handle approximately the same percentage of the total crop per day when selling the 82,784 bags as they were able to harvest and sell day by day of the actual 42,634 bags raised, we find by the chart that the bulk of the theoret-

ical crop would have been sold after the first three days of prices which were the only days when the prices for medium onions went to $2.10 or above per bag.

What kind of "simple arithmetical average" of the f.o.b. prices is meant? From a study of Shoemake's Exhibit A, it is noted that the onion bags were sold in lots of approximately 600 50-pound sacks; the prices for each lot varied during each day; some days as many as eight different prices were received for the different groups of bags sold. In the chart (Addendum, Table V), we have averaged each day's prices as shown in the record by the Federal State Market News Service for the Stockton District; considering the prices for medium onions only, which respondents say that they used, we find that on June 24 and June 25, which would be the 8th and 9th days of selling, when compared with the number of bags sold of the actual crop on the 8th and 9th days, there would be the largest number of bags sold of the theoretical crop at a time when the daily prices for medium onions averaged only $1.95 and $1.90 per bag, respectively; projecting the activity which took place in selling the actual crop into the sale of the theoretical crop, on June 24, 13,980 bags would have been sold, which would have meant a return of $27,261 at the average price for medium onions of $1.95 per bag; under the proposition of the respondents that a general average of $2.10 per bag should have been used the return for the day would be $29,358, or a difference of $2,097 for one day of the 13 days that sales were made.

We thus find that the trial court was in error in using the price of $2.10 per bag as the selling price. While the cost accountant witness used this careless figure, it cannot stand up against other evidence that demonstrates mathematically that it is wrong. Furthermore, the trial court erred in failing to deduct brokerage which was established by uncontradicted evidence. An error was also committed in deducting $0.72 per bag as harvesting costs rather than $1.00 per bag which figure was contractually binding. It will be necessary for the trial court to make a new and thoroughgoing examination of all elements involved in damages; we do not wish to be understood as necessarily imposing upon the trier of fact the specific data contained in Table V in finally finding the damages; that table is used by us to illustrate the error in assuming $2.10 as the proven price per bag, and there may be other evidence on retrial which will modify the figures finally used.

The judgment is reversed as to the damages allowed cross-complainants and the cause remanded for retrial as to that issue only.

Stone, J., concurred.

Brown (R.M.), J., being disqualified, did not participate.

The petitions of appellant and the respondents for a rehearing were denied June 29, 1964. Brown (R. M.), J., did not participate therein. Their petitions for a hearing by the Supreme Court were denied July 29, 1964.

## ADDENDUM TO OPINION
### TABLE I
### MEDIUM ONIONS

| AVERAGE PRICE OF MEDIUM ONIONS FROM JUNE 17 TO JULY 1. | | AVERAGE PRICES OF MEDIUM ONIONS FROM JUNE 17 TO JUNE 30. | |
|---|---|---|---|
| June 17 - | $2.40 | June 17 - | $2.40 |
| | 2.50 | | 2.50 |
| June 18 - | 2.25 | June 18 - | 2.25 |
| | 2.40 | | 2.40 |
| June 19 - | 2.15 | June 19 - | 2.15 |
| | 2.40 | | 2.40 |
| June 20 - | 2.00 | June 20 - | 2.00 |
| | 2.15 | | 2.15 |
| June 21 - | 2.00 | June 21 - | 2.00 |
| June 22 - | Saturday | June 22 - | Saturday |
| June 23 - | Sunday | June 23 - | Sunday |
| June 24 - | 1.90 | June 24 - | 1.90 |
| | 2.00 | | 2.00 |
| June 25 - | 1.90 | June 25 - | 1.90 |
| June 26 - | 1.75 | June 26 - | 1.75 |
| | 1.90 | | 1.90 |
| June 27 - | 1.75 | June 27 - | 1.75 |
| June 28 - | 1.65 | June 28 - | 1.65 |
| | 1.75 | | 1.75 |
| June 29 - | Saturday | June 29 - | Saturday |
| June 30 - | Sunday | June 30 - | Sunday |
| July 1 - | 1.50 | | |
| July 1 - | 1.60 | | |
| | $ 37.95 | | $ 34.85 |

$37.95 ÷ 19 = $1.99 Average $34.85 ÷ 17 = $2.05 Average

## *ADDENDUM TO OPINION*
## *TABLE II*
### *LARGE ONIONS*

| AVERAGE PRICE OF *LARGE* ONIONS FROM *JUNE 17 TO JUNE 30.* | | AVERAGE PRICES OF *LARGE* ONIONS FROM *JUNE 17 TO JULY 1.* | |
|---|---|---|---|
| June 17 - | $2.50 | June 17 - | $2.50 |
| June 18 - | 2.25 | June 18 - | 2.25 |
| | 2.40 | | 2.40 |
| June 19 - | 2.15 | June 19 - | 2.15 |
| | 2.40 | | 2.40 |
| June 20 - | 2.00 | June 20 - | 2.00 |
| | 2.15 | | 2.15 |
| June 21 - | 2.00 | June 21 - | 2.00 |
| | 2.15 | | 2.15 |
| June 22 - | Saturday | June 22 - | Saturday |
| June 23 - | Sunday | June 23 - | Sunday |
| June 24 - | 2.00 | June 24 - | 2.00 |
| | 2.25 | | 2.25 |
| June 25 - | 1.90 | June 25 - | 1.90 |
| | 2.25 | | 2.25 |
| June 26 - | 1.85 | June 26 - | 1.85 |
| | 2.00 | | 2.00 |
| June 27 - | 1.75 | June 27 - | 1.75 |
| | 1.90 | | 1.90 |
| June 28 - | 1.65 | June 28 - | 1.65 |
| | 2.00 | | 2.00 |
| June 29 - | Saturday | June 29 - | Saturday |
| June 30 - | Sunday | June 30 - | Sunday |
| | | July 1 - | 1.75 |
| | | | 1.90 |
| | $39.55 | | $43.20 |

$39.55 ÷ 19 = $2.08 Average $43.20 ÷ 21 = $2.06 Average

*ADDENDUM TO OPINION*
*TABLE III*

*AVERAGE PRICE OF MEDIUM AND LARGE ONIONS*
*FROM JUNE 17 to JUNE 30*

| | |
|---|---|
| June 17 - | $2.40 |
| | 2.50 |
| | 2.50 |
| June 18 - | 2.25 |
| | 2.40 |
| | 2.25 |
| | 2.40 |
| June 19 - | 2.15 |
| | 2.40 |
| | 2.15 |
| | 2.40 |
| June 20 - | 2.00 |
| | 2.15 |
| | 2.00 |
| | 2.15 |
| June 21 - | 2.00 |
| | 2.00 |
| | 2.15 |
| June 22 - | Saturday |
| June 23 - | Sunday |
| June 24 - | 1.90 |
| | 2.00 |
| | 2.00 |
| | 2.25 |
| June 25 - | 1.90 |
| | 1.90 |
| | 2.25 |
| June 26 - | 1.75 |
| | 1.90 |
| | 1.85 |
| | 2.00 |
| June 27 - | 1.75 |
| | 1.75 |
| | 1.90 |

June 28 - 1.65
 1.75
 1.65
 2.00

June 29 - Saturday

June 30 - Sunday
 $74.40

$74.40 ÷ 36 = $2.07 Average

### ADDENDUM TO OPINION
### TABLE IV

*MEDIUM AND LARGE ONIONS*
*AVERAGE PRICE OF MEDIUM AND LARGE ONIONS*
*FROM JUNE 17 TO JULY 1.*

June 17 - $2.40
 2.50
 2.50

June 18 - 2.25
 2.40
 2.25
 2.40

June 19 - 2.15
 2.40
 2.15
 2.40

June 20 - 2.00
 2.15
 2.00
 2.15

June 21 - 2.00
 2.00
 2.15

June 22 - Saturday

June 23 - Sunday

June 24 - 1.90
 2.00

| | |
|------------|----------|
| | . 2.00 |
| | 2.25 |
| June 25 - | 1.90 |
| | 1.90 |
| | 2.25 |
| June 26 - | 1.75 |
| | 1.90 |
| | 1.85 |
| | 2.00 |
| June 27 - | 1.75 |
| | 1.75 |
| | 1.90 |
| June 28 - | 1.65 |
| | 1.75 |
| | 1.65 |
| | 2.00 |
| June 29 - | Saturday |
| June 30 - | Sunday |
| July 1 - | 1.50 |
| | 1.60 |
| | 1.75 |
| | 1.90 |
| | $81.15 |

$81.15 ÷ 40 = $2.03 Average

ADDENDUM TO OPINION

TABLE V

| | ACTUAL SALE OF 42,634 BAGS | | | | | THEORETICAL SALE TWO WEEKS PRIOR OF 82,784 BAGS | | | | | | | | | | |
| | No. of Bags Sold Each Day | | % of Actual Crop Sold Each Day | | Total Amount Received | | Medium Onions | | | Large Onions | | | Total Bags Which Would Have Been Sold Each Day | Total Amount Which Would Have Been Received From All Bags Each Day | Average Price of Each Day Marketing Report | |
| DATE | Medium | Large | Medium | Large | | DATE | % of 82,784 Crop | No. of Bags | Theoretical Amt. Received | % of 82,784 Crop | No. of Bags | Theoretical Amt. Received | | | Medium | Large |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tues., July 2 | 250 | 70 | .003563 | .001641 | $ 522.50 | Mon., June 17 | .003563 | 485 | $ 1,188.25 | .001641 | 136 | $ 340.00 | 621 | $ 1,528.25 | $2.45 | $2.50 |
| Wed., July 3 | 1365 | 935 | .032016 | .021930 | 3,538.31 | Tues., June 18 | .032016 | 2650 | 6,161.25 | .021930 | 1815 | 4,219.87 | 4465 | 10,381.12 | 2.325 | 2.325 |
| Thurs., July 4 | 2388 | 600 | .056011 | .014073 | 3,867.81 | Wed., June 19 | .056011 | 4637 | 10,849.17 | .014073 | 1165 | 2,650.37 | 5802 | 13,199.54 | 2.275 | 2.275 |
| Fri., July 5 | 2400 | 1200 | .056293 | .028146 | 3,955.70 | Thurs., June 20 | .056293 | 4660 | 9,669.50 | .028146 | 2330 | 4,834.75 | 6990 | 14,504.25 | 2.075 | 2.075 |
| Sat., July 6 | 3750 | 1800 | .087957 | .042219 | 7,708.10 | Fri., June 21 | .087957 | 7281 | 14,562.00 | .042219 | 3495 | 7,247.97 | 10,776 | 21,809.97 | 2.00 | 2.075 |
| Sun., July 7 | 1200 | 600 | .028146 | .014073 | 2,005.69 | Sat., June 22 | .028146 | 2330 | *using Mon. Price 6/24 4,543.50 | .014073 | *using Mon. Price 6/24 1165 | 2,475.62 | 3495 | 7,019.12 | Saturday no price listed | |
| Mon., July 8 | 3820 | 1235 | .089959 | .030140 | 5,709.09 | Sun., June 23 | .089959 | 7417 | *using Mon. Price 6/24 14,465.15 | .030140 | *using Mon. Price 6/24 2495 | 5,301.87 | 9912 | 19,765.02 | Sunday no price listed | |
| Tues., July 9 | 3800 | 3400 | .089130 | .079748 | 7,125.18 | Mon., June 24 | .089130 | 7378 | 14,387.10 | .079748 | 6602 | 14,029.25 | 13,980 | 28,416.35 | 1.95 | 2.125 |
| Wed., July 10 | 4800 | 1800 | .112586 | .042219 | 7,208.51 | Tues., June 25 | .112586 | 9320 | 17,706.00 | .042219 | 3495 | 7,232.12 | 12,815 | 24,950.12 | 1.90 | 2.075 |
| Thurs., July 11 | 1250 | 1765 | .029319 | .041398 | 2,975.32 | Wed., June 26 | .029319 | 2427 | 4,429.27 | .041398 | 3427 | 6,596.97 | 5854 | 11,026.24 | 1.825 | 1.925 |
| Fri., July 12 | 1755 | None Sold | .041187 | None | 1,751.64 | Thurs., June 27 | .041187 | 3410 | 5,957.50 | None | None | None | 3410 | 5,957.50 | 1.75 | 1.825 |
| Sat., July 13 | 1800 | None Sold | .042219 | None | 2,192.33 | Fri., June 28 | .042219 | 3495 | 5,941.50 | None | None | None | 3495 | 5,941.50 | 1.70 | 1.825 |
| Sun., July 14 | None Sold | None Sold | None | None | None | Sat., June 29 | None | None | None | None | None | None | None | None | Saturday No price listed; no onions were sold | |
| Mon., July 15 | None Sold | None Sold | None | None | None | Sun., June 30 | None | None | None | None | None | None | None | None | Sunday No price listed; no onions were sold | |
| Tues., July 16 | 600 | None Sold | .014073 | None | 660.00 | Mon., July 1 | .014073 | 1165 | 1,805.75 | None | None | None | 1165 | 1,805.75 | 1.55 | |
| TOTALS: | 29,179 (Total Bags: 42,634) | 13,435 (Total Bags: 42,634) | .688399 | .315587 | $49,220.18 | TOTALS | .688399 | 56,655 | $111,375.94 | .315587 | 26,125 | $54,948.79 | 82,780 | $166,324.73 | | |

*Market News lists no prices for Saturdays and Sundays